

FILED
JAN - 9 2014
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Norfolk Division)

| | |
|---|---|
| Michael Williamson, The Estate of Don C. Craft, Kirk O'Donnell, John Lettow, Timothy McGinnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman, and International Deep Sea Survey, Inc., | : : : : : Civil Action No. 2:14cv9 : |
| Plaintiffs, | : |
| -vs- | : |
| Columbus-America Discovery Group, Inc. and Recovery Limited Partnership, | : : |
| Defendants. | : : |

### VERIFIED COMPLAINT

Plaintiffs, Michael Williamson, The Estate of Don C. Craft, Kirk O'Donnell, John Lettow, Timothy McGinnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman (the "Individual Plaintiffs"), and International Deep Sea Survey, Inc. ("IDSS") (collectively "Plaintiffs"), by and through their attorneys, Holland & Knight LLP, for their verified complaint against defendants Columbus-America Discovery Group, Inc. ("CADG") and Recovery Limited Partnership ("RLP") allege, upon information and belief, as follows:

### JURISDICTION AND PARTIES

1. This is a case of admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333 as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2. This matter is brought as an ancillary security proceeding in support of Plaintiffs' claims pending before the United States District Court for the Southern District of Ohio in a matter captioned *Williamson et al. v. Recovery Limited Partnership et al.*, No. 06 Civ. 262 (S.D.Ohio), which matter was commenced on March 31, 2006 (the "Ohio Litigation").

3. The Plaintiffs are persons or entities that Defendants in the Ohio Litigation – including but not limited to CADG and RLP – promised remuneration based on the gross value of gold, silver and valuable artifacts recovered from the shipwreck of the *S.S. Central America* (the "Treasure"), a United States Mail Steamship that sank off the coast of South Carolina in 1857. Specifically, Plaintiffs were promised a percentage of the gross value of the recovered Treasure as consideration for executing non-disclosure and non-compete agreements. The Individual Plaintiffs all are members of Ohio Litigation defendant Thomas G. Thompson's team, which first imaged the *S.S. Central America* in 1986 and which confirmed that it was the *S.S. Central America* in 1988, and which subsequently recovered the Treasure from the sunken ship. Despite there being unquestionable proof that literally tons of gold and other valuables were recovered from the *S.S. Central America*, the Ohio Litigation defendants never have paid the Plaintiffs as promised and have refused to provide the Plaintiffs with any information as to what happened to the Treasure (or the proceeds from the Treasure). Defendants' failure to pay the Plaintiffs and to provide the requested information constitutes a breach of contract.

4. At all times material herein, the Plaintiffs were individuals that resided, or were companies incorporated and with principal places of business, in states of the United States.

5. The Individual Plaintiffs all are persons who provided technical expertise to one or more of the Ohio Litigation defendants – including but not limited to CADG and RLP – in the course of the search for and/or recovery of the Treasure.

6. Plaintiff IDSS rented deep sea survey equipment to RLP and CADG in the course of the search for and/or recovery of the Treasure.

7. RLP is a limited partnership organized under the laws of the State of Ohio, with its principal place of business at 433 W. Sixth Avenue, Columbus, Ohio.

8. Ohio Litigation defendant Columbus Exploration, LLC ("CXLLC") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Pogy Place, Fernandina Beach, Florida and with a mailing address of 433 W. Sixth Avenue, Columbus, Ohio.

9. RLP and CXLLC currently are in receivership pursuant to a proceeding commenced by investors of RLP and CXLLC to displace former management. The decision of the Franklin County Court of Common Pleas (the "Ohio State Court") granting the investors' motion to appoint a receiver, Ira Kane (the "Receiver"), was rendered May 23, 2013, and the Ohio State Court order appointing the Receiver was issued on June 14, 2013. True and accurate copies of the Ohio State Court's May 23, 2013 decision appointing the Receiver and its June 14, 2013 order appointing the Receiver are annexed as Exhibit 1.

10. Defendant CADG is a corporation organized under the laws of the State of Ohio, with its principal place of business at 433 W. Sixth Avenue, Columbus, Ohio. A true copy of CADG's current status from the Ohio Secretary of State website is annexed as Exhibit 2. Ohio Defendant Thompson is the president and sole owner of CADG. Ohio Defendant Thompson also is (or was) a member of Defendant CXLLC and served as the chairman of the company's board of directors. Thompson also was formerly the general partner of Defendant RLP.

## RELATED LITIGATION

11. In addition to the Ohio Litigation mentioned above in paragraph 2, other proceedings that have been filed that are related to this proceeding include, but are not necessarily limited to, the following matters in the jurisdictions indicated:

a. *Williamson et al. v. Recovery Limited Partnership et al.*, No. 06 Civ. 5724 (S.D.N.Y.) (filed July 28, 2006) and *Williamson et al. v. Recovery Limited Partnership et al.*, No. 11 Civ. 2015 (S.D.N.Y.) (filed Mar. 23, 2011) (collectively, the "New York Rule B Proceedings"). The New York Rule B Proceedings were supplemental proceedings – like this one – in which the Plaintiffs sought security for their claims pursuant to Rule B of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Proceedings of the Federal Rules of Civil Procedure. In the first of the New York Rule B Proceedings, District Judge Swain held that the Plaintiffs' claims herein were maritime claims subject to admiralty jurisdiction. *See Williamson v. Recovery Ltd. P'ship*, No. 06 Civ. 5724 (LTS), 2007 WL 102089 (S.D.N.Y. Jan. 16, 2007). That decision was affirmed by the Second Circuit on appeal. *See Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43 (2d Cir. 2008).

b. *Williamson et al. v. Recovery Limited Partnership et al.*, Case No. CV 06-5689 (C.D.Cal.) (filed Sept. 11, 2006) (another Rule B proceeding); and

c. *ABC, plc. v. HIJ, Inc.*, No. 98 Civ. 5036 (S.D.N.Y.) (in which the Plaintiffs filed a motion to intervene and unseal previously-closed and sealed matter filed on August 11, 2006) (the "Christie's Litigation").

## BACKGROUND FACTS

12. In 1977, Ohio Defendant Thompson began researching deep-ocean shipwrecks and the methods and technologies for locating them. Thompson became particularly interested in the *S.S. Central America*, which sank off the coast of South Carolina during a hurricane on September 12, 1857. The *S.S. Central America* was carrying several tons of gold when it sank.

13. Thompson put together a team to conduct a search-and-recovery project for the *S.S. Central America*, and in 1985 he organized RLP as an Ohio limited partnership to finance the project. Thompson then began soliciting leaders from the Central Ohio business community to invest in RLP.

14. In May 1985 the limited partnership agreement for RLP was executed. Under the terms of the agreement, Thompson was to act as general partner of RLP. Until the Receiver was appointed in May 2013, Thompson had directly or indirectly managed the finances and operations of RLP since its inception.

15. Thompson's team went to sea in the summer of 1986 to begin their search for the *S.S. Central America*. The Individual Plaintiffs all were members of Thompson's team, and RLP contracted with IDSS for the rental of IDSS equipment that was critical to Thompson's team succeeding in finding the *S.S. Central America*.

16. The Individual Plaintiffs all were paid in part or in full for their service and labor pursuant to oral or written agreements. In addition to their employment agreements, the Individual Plaintiffs were required to execute separate, distinct, non-disclosure and non-compete agreements with Thompson (the "NDAs"), in consideration for which each of the Individual Plaintiffs was promised remuneration not in definite sum, but rather based on a percentage of the value of the total Treasure recovered from the wreck of the *S.S. Central America*, without

5

deduction for competing claims or recovery, marketing or other expenses. As part of its compensation package, IDSS similarly was promised additional compensation based on a percentage of the value of the total Treasure recovered from the wreck of the *S.S. Central America*, without deduction for competing claims or recovery, marketing or other expenses. True copies of the Individual Plaintiffs' NDAs are annexed as Exhibit 3, and the IDSS Agreement is annexed as Exhibit 4 (the NDAs and the IDSS Agreement will be referred to collectively as the "Agreements").

17. In September 1988, during the third year of the search effort, Thompson and his team (including some or all of the Individual Plaintiffs) confirmed that a wreck site imaged by IDSS's equipment during search operations in 1986 was the wreck of the *S.S. Central America*. The wreck site was approximately 160 miles off the coast of South Carolina, in approximately 8,000 feet of water. Thompson and his team (including some of the Individual Plaintiffs) were successful in recovering *S.S. Central America's* bronze bell, a gold bar, and certain artifacts before they had to come ashore for the winter. Ultimately, Thompson and his team were able to recover approximately three tons of gold and silver as well as numerous artifacts from the *S.S. Central America*.

18. Over a year earlier, on May 27, 1987, CADG had commenced an admiralty proceeding concerning the *S.S. Central America* in this Court to establish ownership of the shipwreck and all of its contents (the "Salvage Litigation").

19. In the original Verified Complaint filed in the Salvage Litigation on May 27, 1987, the plaintiff called itself "Columbus-America Deep Search, Inc. d/b/a Columbus-America Discovery Group." A true copy of the original Verified Complaint dated May 27, 1987 and filed in the Salvage Litigation is annexed as Exhibit 5.

20. CADG moved the Court to appoint it as Salvor-in-Possession and to enjoin all others from undertaking efforts to salvage the shipwreck, which motion was granted. True copies of CADG's motion papers and the order granting CADG's requested injunction are annexed as Exhibit 6. CADG moved the Court to be appointed Substitute Custodian of the Treasure and the shipwreck as it was recovered from the shipwreck, which motion likewise was granted. True copies of CADG's motion papers and the order granting CADG's requested status as Substitute Custodian are annexed as Exhibit 7. CADG has remained as the Court-appointed salvor and Substitute Custodian of the shipwreck for the last 26 years.

21. During certain of the Salvage Litigation proceedings, members of the Individual Plaintiffs provided testimony in support of CADG's claims. The Salvage Litigation's first trial was held in April 1990, during which a multitude of insurance companies (the "Underwriters") claimed either a direct or descendant subrogated interest in the Treasure recovered from the *S.S. Central America* resulting from insurance claims paid resulting from the loss of the *S.S. Central America*. In a decision dated August 14, 1990, Senior District Judge Kellam of this Court held that the Underwriters had abandoned any claim that they might have to the Treasure and dismissed the Underwriters' claims in their entirety. *See Columbus-America Discovery Group, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel*, 742 F. Supp. 1327 (E.D.Va. 1990). The Underwriters appealed the district court's decision.

22. Shortly after the conclusion of the first trial in the Salvage Litigation, in response to inquiries made by the Plaintiffs herein and their attorneys as to when they would be paid under their respective Agreements, Thompson wrote each of the Plaintiffs a letter (the "1990 letter") and promised that payment would be forthcoming after resolution of the Salvage Litigation and

marketing of the recovered Treasure had been effected. An exemplary copy of Thompson's 1990 letter is annexed as Exhibit 8.

23. During the several months following distribution of the 1990 letter, Thompson spoke to several of the Individual Plaintiffs and asked them "to call off the lawyers" (i.e., for the Individual Plaintiffs to instruct their attorneys to hold off filing suit or otherwise pressuring defendants regarding payment of their claims under the NDAs). When speaking with those members of the Individual Plaintiffs, Thompson confirmed that the amounts to be paid the Plaintiffs under the Agreements was to be based on the gross amount received from the sale of the Treasure, without deduction for search expenses, recovery expenses, legal expenses, marketing expenses, salaries, competing claims or other costs.

24. Having received these written and oral assurances, the Plaintiffs consented to Thompson's request and instructed their attorneys to desist in pressing their requests for payment.

25. The following year, on August 26, 1992, the United States Court of Appeals for the Fourth Circuit reversed Senior District Judge Kellam's decision dismissing the Underwriters' claim as abandoned and its decision to not afford intervening parties an opportunity to conduct discovery. The Fourth Circuit remanded the case to this Court for further proceedings. *See Columbus-America Discovery Group v. Atlantic Mutual Ins. Co.*, 974 F.2d 450 (4th Cir. 1992).

26. In the subsequent trial proceedings in 1993, CADG specifically represented to Senior District Judge Kellam in the Salvage Litigation that the fractional share interests of RLP/CADG's independent contractors – including Plaintiffs – had to be paid and that those share interests should be considered by Judge Kellam in determining the amount of the salvage award to be awarded to CADG.

27. After a second trial, on November 18, 1993, Senior District Judge Kellam awarded CADG 90% of the insured Treasure and 100% of the uninsured Treasure. *See Columbus-America Discovery Group, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel*, Civ. A. No. 87-363-N, 1993 WL 580900 (E.D.Va. Nov. 18, 1993). The Underwriters once again appealed. On appeal, by decision dated June 14, 1995, the Fourth Circuit affirmed Judge Kellam's decision. *See Columbus-America Discovery Group v. Atlantic Mutual Ins. Co.*, 56 F.3d 556 (4th Cir. 1995).

28. After the Fourth Circuit affirmed the second trial decision, the matter was remanded to the district court for further proceedings, including resolution of the process by which the Treasure would be marketed and sold. Judge Kellam issued orders in 1996 that provided certain terms and conditions under which CADG was to proceed with marketing the entire Treasure, of which the Underwriters would receive their awarded percentage.

29. Although Thompson's companies had been given control of the marketing and sales process, the process became contentious and resulted in further litigation. Eventually, in May 1998, the Underwriters and Thompson's companies settled the marketing and sales dispute by agreeing to divide up the Treasure into the parties' respective portions, which was effected on or about June 17, 1998 and which resulted in CADG (on behalf of some or all of the Defendants) obtaining 92.4% of the Treasure.

30. In January 1999, the Plaintiffs once again instructed their attorneys to contact Defendants' attorneys to obtain information regarding the status of the marketing and sale of the Treasure. Defendants' then-attorney, Richard T. Robol, Esq., visited the Plaintiffs' then-attorney, James T. Shirley, Jr., Esq., to assure the Plaintiffs that they would be paid at the same time that Defendants' investors would be paid. The Plaintiffs' attorney and several attorneys representing

Defendants corresponded over the course of the next year concerning the Plaintiffs' inquiries regarding the status of the marketing and sale of the Treasure.

31. After recovering the Treasure from the *S.S. Central America*, Thompson and/or one or more of the other Defendants initially engaged Christie's Galleries, Inc. auction house to market and sell the Treasure. However, while the Treasure was tied up in the Salvage Litigation, disputes arose between Thompson and Christie's resulting in the Christie's Litigation. As stated above at paragraph 11(c), the Plaintiffs made a motion to intervene and unseal records of the closed Southern District of New York litigation between Christie's and Defendants in order to obtain further information regarding the contract between Christie's and Defendants and the eventual settlement of their dispute. That motion to intervene and unseal the file was denied by United States District Judge Robert Sweet.

32. After the dispute arose between Christie's and Defendants, Thompson engaged another company, California Gold Marketing Group, LLC ("California Gold"), a Newport Beach, California company, to market and sell the recovered Treasure. California Gold was retained in or about December 1999 and began marketing the gold for sale in or about February 2000. As related to Plaintiffs' counsel, James T. Shirley, Esq., of Holland & Knight's New York office in a telephone conversation on February 17, 2000, Defendants' then-attorney (and corporate officer for several of the Ohio Defendants including CADG) Richard Robol, advised Mr. Shirley that Defendants had not relinquished their interest in the Treasure to California Gold. Rather, the "sale" of the Treasure to California Gold was effected in order to give California Gold the ability to represent that it had title to the Treasure for loan and/or sales purposes. A copy of a redacted version of the contract purported to be the sales contract between Defendants RLP/CADG and California Gold (the "Treasure Sale Agreement"), which redacted contract was

annexed to the Declaration of California Gold's Managing Partner Dwight Manley submitted in the Los Angeles Rule B Proceeding, is annexed as part of Exhibit 10 (described below).

33. According to Mr. Robol's statement to Mr. Shirley, Defendants retained an interest of between 25% and 75% of the sales proceeds after California Gold's initial lump sum payment had been recouped, depending on the total Treasure sales proceeds. By letter dated March 2, 2000, Richard T. Robol, Esq. wrote the Plaintiffs on CADG letterhead to report status of marketing and sale of the Treasure. In that letter, CADG advised that "[o]n the marketing front, retail sales have been very robust to date." A copy of CADG's March 2, 2000 letter is annexed as Exhibit 9.

34. According to media reports, as of November 2003, California Gold had sold virtually all of the recovered Treasure. Furthermore, according to Dwight Manley in his Declaration in the Los Angeles Rule B Proceeding, Defendants executed a supplemental agreement with California Gold which purportedly extinguished Defendants' residual interest in the Treasure in or about June 2001 in exchange for a lump sum additional payment. Mr. Manley also submitted that supplemental agreement as an exhibit to his Declaration. A copy of Mr. Manley's full Declaration submitted in the Los Angeles Rule B Proceeding (including the two redacted contracts annexed thereto) is annexed as Exhibit 10.

35. Despite the promises to the Plaintiffs in the NDAs that each of the Plaintiffs would be paid a share of the value of the Treasure, despite the Manley Declaration and annexed agreements purportedly indicating that the Defendants' remaining interest in the Treasure was extinguished in June 2001, and despite the repeated assertions by Defendants' attorneys and Thompson himself that payment was forthcoming, Defendants have not paid any of the

Plaintiffs. Upon information and belief, Thompson likewise has not made any cash distributions to his investors, or otherwise provided them with any return on their investment.

36. According to Defendant Thompson's statements in an interview on Dateline NBC in 1998, he estimated that the recovered Treasure might be valued at as much as $400,000,000.00. He has professed in federal court to secret marketing techniques which will enable him to achieve this value, which is several multiples of the believed bullion value of the recovered Treasure. Indeed, according to news reports, the "Eureka Bar" – the largest gold bar or ingot recovered from the *S.S. Central America* which weighed approximately 80 pounds – sold for $8 million, or roughly $6,250 an ounce at a time when gold's value on the commodities markets was approximately $600 an ounce. A copy of a news release regarding the sale of the "Eureka Bar" is annexed as Exhibit 11. This evidences the Defendants' success in selling pieces of literal bullion – rather than coins – for as much as 10 times the bullion value of the gold. Based on the numismatic value of coins, such returns on the recovered gold coin portion of the Treasure are not to be unexpected. The publicly-reported sale value of the Treasure has been reported as approximately $100,000,000.00.

37. Since at least 2000, Thompson had refused to provide the partners of RLP and the members of CXLLC with any meaningful information regarding the finances and operations of those entities. This resulted in the investors' commencement of litigation to have the Receiver appointed and, ultimately, to the Ohio State Court's appointment of the Receiver.


## STATUS OF THE OHIO LITIGATION

38. In early 2011, the parties in the Ohio Litigation exchanged summary judgment motions. On June 3, 2011, District Judge Sargus granted Plaintiffs summary judgment on, *inter alia*, the issue of whether they had performed under their Agreements, holding that the Ohio Defendants (including CADG and RLP) were judicially estopped from contesting the Plaintiffs' performance of their obligations under the Agreements. *See Williamson v. Recovery Ltd. P'ship*, No. 2:06-CV-292, 2011 WL 2181813, at *32 (S.D. Ohio June 3, 2011), *aff'd*, 731 F.3d 608 (6th Cir. 2013).

39. Furthermore, Judge Sargus held that Plaintiffs' evidence offered as to CADG's liability under alter ego and/or veil-piercing theories of liability was sufficient to proceed to trial, stating that:

> *"[i]f the evidence offered by Plaintiffs is construed in their favor, some evidence supports the claim that RLP, CADG, Economic Zone, and EZRA were so dominated and controlled by Thompson as to give rise to joint liability under the NDAs and Lease Agreement .... The matter involves genuine issues of material fact. Issues regarding the exact relationships and degree of control exercised among and between these entities are best resolved with testimony at trial."*

*Id.* at *29.

40. After the Sixth Circuit affirmed all of Judge Sargus' rulings in Plaintiffs' favor on appeal by its decision dated October 2, 2013, the Ohio Litigation was remanded to the district court and trial on the Plaintiffs' claims is expected within the next several months.

## DEFENDANTS' INTENTION TO RECOMMENCE SALVAGE OPERATIONS

41. On September 30, 2013, the Receiver of RLP and CXLLC filed his "Application of Receiver for Approval of Receiver's Initial Receivership Plan and Report," which application was approved by the Ohio State Court on October 10, 2013. True copies of the Receiver's Application and the Ohio State Court order are annexed as Exhibits 12 and 13, respectively.

42. As can be seen by review of Exhibit 12 – in Sections IX and X of the Receiver's Initial Receivership Plan and Report at pages 14 through 24 – the Receiver has developed a comprehensive plan to recommence salvage operations on the shipwreck in less than four months time.

43. When further Treasure is recovered from the shipwreck site, that Treasure must be delivered to this Court as this Court retains continuing jurisdiction over the wreck and CADG as Salvor-in-Possession and Substitute Custodian. *See Columbus-America Discovery Group v. Atlantic Mut. Ins. Co.*, 203 F.3d 291, 301 (4th Cir. 2000) (stating that "[we] hold that the jurisdiction of the district court over the wreck of the *Central America* in the *in rem* [salvage] action yet continues . . . ."). The Court will then make its award as to further recovered Treasure, presumably awarding that Treasure to CADG as Salvor-in-Possession.

## PLAINTIFFS' DAMAGES CALCULATION

44. Using the reported sales figure of $100,000,000.00, Defendants are liable to the Plaintiffs in the principal amount of $1,975,000.00, exclusive of interest and costs. This figure is based on the consideration promised under the Agreements, which collectively totaled 1.975% of the value of the Treasure as set forth in paragraph 54 below. This figure is based solely on the Treasure recovered to date, and does not reflect any claims that Plaintiffs may have against further recoveries of Treasure from the shipwreck.

45. In addition to the principal amount owed, the Plaintiffs also are entitled to recover reasonable prejudgment interest on their claim. As noted by Judge Sargus in his June 3, 2011 summary judgment decision, Plaintiffs' cause of action accrued in June 1995 after the Fourth Circuit affirmed this Court's salvage award from November 1993. *See Williamson v. Recovery Ltd. P'ship*, No. 2:06-CV-292, 2011 WL 2181813, at *12 (S.D. Ohio June 3, 2011), *aff'd*, 731 F.3d 608 (6th Cir. 2013).

46. Using an estimated compound interest rate of 7.0% (which is based on review of the prime rate reported in the Wall Street Journal between 1995 and the present), the total interest damages for the period from 1995 until June 2014 is $5,167,641.88. The total principal and estimated interest amount due on the recovered Treasure at the approximate time when a trial decision may be rendered is $7,142,641.88.

47. Defendants CADG and RLP cannot be found within the Eastern District of Virginia, but have tangible or intangible property within the jurisdiction or which is likely to be within the jurisdiction in the near future, to wit: CADG's property right as Salvor-in-Possession as well as any actual Treasure salvaged from the wreck of the *S.S. Central America* that will be brought into this jurisdiction to be awarded by this Court under its continuing jurisdiction over the wreck. RLP has filed a motion in the Salvage Litigation proceeding to change the identity of the Salvor-in-Possession (and presumably the Substitute Custodian) after approximately 26 years. While Plaintiffs intend to oppose RLP's application, to the extent that CADG's rights are considered to be RLP's rights, Plaintiffs seek to attach those rights as well.

48. In accordance with the Agreements' forum selection clauses, all disputes arising out of those agreements are to be litigated in Ohio. However, the action herein, submitted in accordance with Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of

the Federal Rules of Civil Procedure, is not and cannot be considered a waiver of the forum selection clauses in the Agreements.

## COUNT I

## BREACH OF CONTRACT

49. Plaintiffs incorporate by reference Paragraphs 1 through 48 above.

50. Each of the Individual Plaintiffs' NDAs provides that, in consideration for the Individual Plaintiffs' promise to not disclose information regarding the *S.S. Central America* project and to not compete with that project, Defendants would remunerate each of the Individual Plaintiffs in an amount to be based on the value of the Treasure recovered from the *S.S. Central America*.

51. In addition to certain rental fees and expenses provided in the IDSS Agreement, Defendant RLP promised to give IDSS .9% of the total Treasure recovered off the *S.S. Central America*.

52. As found by Judge Sargus in the Ohio Litigation, Plaintiffs have proven that they have performed under their Agreements.

53. As further found by Judge Sargus, a general issue of material fact exists requiring trial as to both CADG's and RLP's joint liability under the Agreements.

54. Each of the Plaintiffs, having complied with his/its obligations under the Agreements, is entitled to compensation in accordance with the terms of the Agreements. The respective percentages owed each of the Plaintiffs is as follows:

| | |
|---|---|
| Michael Williamson: | .45% (45/100 of 1%) |
| Don C. Craft: | .35% (35/100 of 1%) |
| Kirk O'Donnell: | .025% (2.5/100 of 1%) |
| John Lettow: | .05% (5/100 of 1%) |
| Timothy McGinnis: | .025% (2.5/100 of 1%) |
| Fred Newton: | .025% (2.5/100 of 1%) |
| Chris Hancock | .05% (5/10 of 1%) |
| Dale Schoeneman | .05% (5/100 of 1%) |
| William Watson: | .05% (5/100 of 1%) |
| IDSS | 0.9% (90/100 of 1%) |
| **Total:** | **1.975%** |

55. Despite being entitled to payment under their Agreements, and despite numerous demands to Defendants' attorneys for payment under the Agreements having been made, Plaintiffs have not been paid their consideration under the Agreements.

56. Defendants' failure to pay the Plaintiffs their consideration due under the Agreements constitutes a breach of contract, as a result of which each of the Plaintiffs has been damaged and is entitled to bring his/its claim herein.

57. As a result of all the foregoing, and as described above in paragraphs 44 to 46 above, Defendants are liable to the Plaintiffs in the principal amount of $1,975,000.00, plus estimated interest of $5,167,641.88, for a total amount of $7,142,641.88.

**WHEREFORE**, Plaintiffs Michael Williamson, The Estate of Don C. Craft, Kirk O'Donnell, John Lettow, Timothy McGinnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman, and International Deep Sea Survey, Inc. request judgment as follows:

1. That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment and garnishment be issued against the tangible and intangible property of Defendants within this District listed in PARAGRAPH FORTY-SEVEN of this Verified Complaint;

2. That Defendants and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3. That judgment be entered in favor of Plaintiffs and against Defendants in the amount of $7,142,641.88 (including estimated interest); and

4. That this Court grant Plaintiffs such other and further relief which it may deem just and proper.

Dated: January 8, 2014

HOLLAND & KNIGHT LLP

By: _____
Andrew R. Oja (VSB # 80764)
1600 Tysons Blvd, Suite 700
Tysons Corner, Virginia 22102
(703) 720-8600
(703) 720-8610 (facsimile)
andrew.oja@hklaw.com
*Attorneys for Plaintiffs*

*Of Counsel:*
Michael J. Frevola
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019
*Pro Hac Vice Application Pending*

## VERIFICATION

STATE OF NEW YORK            )
                             :ss.:
COUNTY OF NEW YORK           )

MICHAEL J. FREVOLA, being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for Plaintiffs Michael Williamson, The Estate of Don C. Craft, Kirk O'Donnell, John Lettow, Timothy McGinnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman, and International Deep Sea Survey, Inc. ("Plaintiffs") in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Plaintiffs and discussed the matter by telephone with Plaintiffs. I am authorized by Plaintiffs to make this verification, and the reason for my making it is that none of the Plaintiffs are within the jurisdiction of this Honorable Court.

_____
Michael J. Frevola

Sworn to before me this
8th day of January, 2014

_____
Notary Public

Elvin Ramos
Notary Public, State of New York
NO. 01RA4870243
Qualified in Queens County
Certificate filed in New York County
Commission Expires September 2, 2014

#10201299_v1